EDWARD C. MAURAN, Adjutant General of the State of Rhode Island, Relator, v. JAMES Y. SMITH, Governor, Captain·General and Commander-in-Chief of the military and naval forces of the State of Rhode Island.

A writ of *mandamus* is not issuable from the Supreme Court to the Governor of the State, to direct him, as Commander-in-Chief, to perform a duty which is properly within the sphere of his duties as Commander-in-Chief, though the same is imposed upon him by a statute of the State.

PETITION for a writ of *mandamus*, commanding the respondent to show cause why a peremptory writ of mandamus should not issue, requiring respondent to release the petitioner from arrest, or to inform him of the cause of the revocation of his commission of Adjutant General, and to see that charges are duly preferred against him, and a court martial convened to try the same. The petition was filed on the 16th of October, and citation thereon made returnable on the 17th. The respondent appeared by counsel on the 17th, but withheld answer until November 1st. The relator's replication was filed on the 1st of · November, and, on the 18th, the matter came up for hearing upon the pleadings and exhibits.

The material allegations in the petition were substantially as follows : That in March, 1861, the petitioner was elected Adjutant General of the State, for a term of five years, and was in discharge of his duties under that appointment, when, on the 23d of September, 1865, he received the following communication :—

"STATE OF RHODE ISLAND.

EXECUTIVE DEPARTMENT, }
Providence, Sept. 22, 1865. }

" BRIG. GEN. E. C. MAURAN, Adjutant General :—

" DEAR SIR,—I feel it my duty to ask you to resign your commission as Adjutant General of this State.

" I take this course in preference to preferring charges or re-

voking your commission, which I feel called upon to do, for acts brought to my knowledge in filling certificates that persons are credited to our quota, when no such record was found in your office. Very respectfully,

JAMES Y. SMITH,
*Governor and Commander-in-Chief.*

" P. S.—An immediate answer required."

That to this, the petitioner made reply as follows, on the 25th of September :—

" STATE OF RHODE ISLAND, &C.

ADJUTANT GENERAL'S OFFICE, }
Providence, Sept. 25th, 1865. }

"His Excellency JAMES Y. SMITH, Governor and Commander-in-Chief:—

" SIR,—I have the honor to acknowledge the receipt of your communication of the 22d instant, and, in reply, I have to inform your Excellency that I respectfully decline to resign my commission as Adjutant General.

Very respectfully, your obedient servant,
EDWARD C. MAURAN,
*Adjutant General.*"

And that, with this reply, was delivered to the respondent a communication, dated September 25th, signed by the three counsellors of the petitioner, in these words :—

" To His Excellency, JAMES Y. SMITH, Governor and Commander-in-Chief, &c. :—

·" SIR,—We have been consulted by Gen. Mauran, as counsel, and his refusal to resign his office, herewith transmitted, is in accordance with our advice. It seems to us that there is no good cause for the revocation of his commission, and that inconvenience and the expense of a trial by court martial may be avoided by a conference. If you agree with us, we shall be happy to meet you, or any person you may name for that purpose. Very respectfully.

That, on the same day, the respondent made reply to the petitioner, as follows:—

"Brig. Gen. E. C. Mauran:—

"Sir,—I have your letter declining to resign your commission as Adjutant General of this State, as you promised me you would do to-day.

"I now, therefore, revoke your commission as Adjutant General of the State of Rhode Island, in accordance with my letter of .the 22d instant.

"You will at once deliver over the books, papers, and property of the State, to Brigadier General Henrie Crandall, who has been appointed as your successor.

Respectfully,

James Y. Smith,
*Governor and Commander-in-Chief.*"

And to his counsellors aforesaid, as follows:—

"Gentlemen,—I have your communication of this date, and do not think a conference necessary, as I have revoked the commission of Brigadier General E. C. Mauran, Adjutant General of the State of Rhode Island.

I am, most truly,

James Y. Smith,
*Governor.*"

That, on the same day, September 25th, the petitioner delivered to the respondent the following communication:—

"STATE OF RHODE ISLAND, &C.

Adjutant General's Office,
Providence, Sept. 25th, 1865.

"His Excellency, James Y. Smith, Governor and Commander-in-Chief:—

"Sir,—Having received notice of your having this day revoked my commission of Adjutant General of the State of

Rhode Island, I hereby demand of your Excellency, as my immediate superior, to be informed of the cause thereof, and to be tried by a court martial therefor:

I have the honor to be, very respectfully,

Your Excellency's obedient servant,

EDWARD C. MAURAN,

*Adjutant General.*"

That, on the 26th day of September, 1865, the petitioner was placed in arrest by order of the respondent, communicated to the petitioner verbally by Colonel Albert S. Gallup, Aide-de-Camp to the respondent, and ordered to report himself to the respondent forthwith, which order the petitioner obeyed. That the petitioner then received from the respondent, a verbal order to report to him again on the 2d day of October, 1865. That on the 28th day of September, 1865, the petitioner received a communication, signed by Charles E. Bailey, Colonel and Aide-de-Camp, being an order from the respondent relieving the petitioner from the duty of reporting on said 2d day of October, and directing him to hold himself in readiness to report whenever called upon. That from that time to the present, the petitioner had received no order or communication from the respondent, and is still held in arrest, and no charges have been preferred against him, and no court martial has been ordered to be convened for his trial, and he is, thereby, disabled from discharging the duties of said office of Adjutant General.

That, on the 9th day of October, 1865, Abraham Payne, Esquire, one of the counsel of the petitioner, by his request, called upon the respondent and said to him: "General Mauran had supposed that the court martial would have been called about this time or before, and I told him I would call and see if you had anything to say about it." To which the respondent replied: "I don't see my way clear to call it at this moment, though I may review that point. There don't seem to be any room for a court martial; the letter is too plain." To which Mr. Payne replied: "But he has demanded a court martial,

has he not?" To which the respondent replied : "Yes, that is true. But the question is about the propriety of granting it; that is the matter now under consideration."

That on the 11th day of October, 1865, the petitioner by his counsel, in a written communication, requested of the respondent to be informed whether he intended to cause charges to be preferred against him, and to order a court martial to be convened to try the same, and if so, within what time. And that, on the same day, the respondent replied as follows :—

"STATE OF RHODE ISLAND.

EXECUTIVE DEPARTMENT, }
Providence, Oct. 11th, 1865. }

"Messrs. ABRAHAM PAYNE, JOSEPH S. PITMAN, SAMUEL CURREY :—

"GENTLEMEN,—I have your communication, and will give the same proper attention.

I have the honor to be, very truly,

JAMES Y. SMITH,
*Governor and Commander-in-Chief.*"

That, since said 11th of October, 1865, no communication had been received by the petitioner from the respondent, no charges had been preferred against the petitioner, and no court martial had been ordered to be convened for his trial. That the petitioner had been held in arrest and deprived of his liberty twenty-one days. That, by the laws of this State, it is provided that general, field, commission and staff officers, shall be subject to trial by court martial, according to the usage and practice of war ; that it is contrary to the usage and practice of war and in violation of the same, to hold an officer in arrest such a length of time, without preferring charges against him, or ordering a court martial to be convened for his trial; and there is no impediment to a court martial being ordered to be convened in this State, within the time prescribed by the usage and practice of war. That, by the articles of war of the United States, it is

provided, that "no officer or soldier who shall be put in arrest or imprisonment, shall continue in his confinement more than eight days, or until such time as a court martial can be conveniently assembled."

That while the laws of this State give the Commander-in-Chief power to revoke the commission of any officer of the militia in his discretion, they also make it imperative upon him, when a demand is made, in due form, upon the immediate superior of such officer, to be informed of the cause thereof and to be tried by a court martial, to see that charges are duly preferred and that a court martial be convened to try the same. Yet that the respondent has hitherto neglected and still doth neglect to cause such charges to be preferred against the petitioner, and a court martial to be convened to try the same, as he is required to do by law. And so your petitioner avers that his arrest and detention aforesaid, by the respondent, without having caused charges to be preferred against him and without ordering a court martial to be convened for his trial, are illegal, unjust, oppressive, and to the manifest injury and wrong of the petitioner.

The respondent in his answer, after stating the facts, which, in his view, justified the course he had adopted in regard to the petition, proceeds to say :

"This respondent sent the letter to said Mauran, set forth in his petition, dated September 22d, 1865, requesting him to resign his commission as Adjutant General, and stating the cause of the request, and, on Saturday, September the 23d, the said Mauran called upon the respondent and told him he would hand respondent the next succeeding Monday, the resignation of his commission as Adjutant General. Yet, on said Monday, the 25th of said September, instead of the resignation of the said Mauran, this respondent received from him the letter of that date, set forth in his petition, declining to resign, and with that letter, another letter set forth in said petition, from three counsellors at law, informing this respondent that they had been consulted as legal advisers of said Mauran, and that, in their opinion, there was no good cause for the revocation of the commission of said Mauran as Adjutant General, and requesting a conference.

" With great respect for those gentlemen, the respondent did not care to take their opinion upon the subject, nor did he deem it consistent with his official duty to inform them at that time of the reasons for the course he had taken or might take in the premises. And when one of said counsellors at law, Mr. Payne, called upon the respondent on the 9th day of October, 1865, as set forth in said petition, and spoke of a court martial, and asked the respondent "What he had to say about it?" the intention of the respondent in reply to that particular question, and in the whole of the conversation, was simply to inform Mr. Payne, in a manner as courteous as possible, that he could tell him nothing more than that the respondent then had the whole subject under consideration.

" And the respondent says that he had information of certain facts in addition to those relative to said certificates, which, though not yet fully authenticated, were of such a nature as to render it his duty to make further inquiry about them, and which, when so authenticated, might require additional charges preferred against the said Mauran.

" And the respondent does not admit so much of the conversation set forth in said petition, between said Payne and himself, as may indicate that the respondent declined convening or expressed any intention not to convene a court martial, and with this qualification he admits all the facts stated in said petition.

" The respondent makes the foregoing statements explanatory of the course, which, in his discretion, he has thought proper to take relative to the matter of said petition, out of respect to this honorable court, and because it appears to him that to do so will not be inconsistent with his official duty or detrimental to the public interests ; and he does not intend thereby to admit that he is bound to state the reasons for his official acts, or to admit the jurisdiction of the court in the premises. In his judgment, as Governor and Commander-in-Chief of its military forces, it was his duty to revoke the commission of said Mauran, as Adjutant General, and subsequently, to place him under arrest; and, previous to the commencement of proceedings in this case, he could not, with due regard to the civil and military

Mauran, Adjutant General, &c., v. Smith, Governor, &c.          ·

service of the State, release the petitioner from arrest, see that charges were preferred against him, convene a court martial to try the same, or inform him of the cause of the revocation of his said commission, more fully than he, the said respondent, had done, verbally and in writing, and particularly by his letter to the petitioner of the 22d day of September, 1865, set forth in the petition aforesaid.

"And this respondent respectfully submits that a writ of mandamus ought not to issue as prayed for, because he says—

"*First.* That the ultimate decision of the questions, whether the commission of an Adjutant General should be revoked, and for what causes, whether he should be placed under arrest or released from arrest, when a court martial should be called for his trial, and when the charges against him should be preferred, rests with the Governor, Captain General and Commander-in-Chief of the military forces of the State, and not with the judiciary ; and that the performance of all the duties which would be required by the writ prayed for, pertains to this respondent in his capacity aforesaid.

"*Second.* That if this court had power to control or direct the respondent in the premises, and to issue the writ prayed for at any time, yet no such writ should issue upon said petition, for after the revocation of said commission, and said arrest, no such time had elapsed, when the petition was presented, as to justify the exercise of that power."

The only portions of the petitioner's replication, of any importance in this connection, were: "That as to so much of said answer as alleges that further inquiry may require additional charges to be preferred against your relator, he respectfully submits that the same is too indefinite to admit of any reply, and that charges which may hereafter be preferred, can furnish no valid reason for neglecting and refusing to convene a court martial for the trial of the charges upon which the commission of your relator was revoked. That as to so much of said answer as denies the jurisdiction of this court in the premises, your relator submits to the judgment of the court thereon. And that as to so much of said answer as alleges that no such

time had elapsed when the petition of your relator was presented, as to justify the exercise of the power of this court in the premises, your relator denies the same, and submits to the judgment of the court thereon."

The court, after some discussion at the bar, ruled that the relator's counsel were entitled to the opening and the close of the argument. For the relator, appeared *Pitman*, *Payne* and *Currey*; for the respondent, *King* and *Blake*.

*Payne, for the relator.*

Of the official acts of the Adjutant General, or of the revocation of his commission by the respondent, nothing need be, or without impropriety, can be said here. These matters are properly cognizable only by a court martial. The power to revoke a commission for proper cause or no cause, is vested in the discretion of the Governor. But when he has exercised this power in respect to a military officer, we claim and insist that the law gives to that officer certain rights, one of which is to demand, within ten days, the convening of a court martial, the presentment of charges, and a trial. This is the law, and it is obvious that it rests upon sound reasons of right and policy. But, on the part of the respondent, it is contended, that whether the Governor shall or shall not, on demand, convene that court for the trial, and *when* he shall do so, are matters entirely within his control, and not subject to revision by the judiciary of the State. To this we do not assent, but hold that the proposition is a fair subject for discussion.

Has this court power to grant the relief sought by the relator? is the question presented; an important one as relates to the powers and jurisdiction of this court, and not less important as relates to individual rights; for practically, only in this mode, can wrongs like those complained of by the relator be redressed. Now it is indisputable that the court has power to issue the writ of *mandamus*, in a proper case; and that, generally speaking, the writ is the appropriate remedy to compel an officer to perform a duty. The respondent, nevertheless, objects to the issuing of such a writ in this instance, but upon what grounds, is not, as yet, distinctly seen. If the objection be that the court has no

power or control over the action of the Governor of the State; I submit that it does not seem to me to have the least force. The Governor is not the sovereign power of the State, as is the Queen of England, against whom, of course, no writ of this kind can be issued by any court,—a mere subordinate officer of her majesty. The writ is not issued in the Governor's name, nor by his authority. Under our government, the sovereign power is the people, organized under the constitution, acting through three departments, each of which, within the sphere of its duties, is independent of the other two; and, from the very nature of the judicial department, it is the final and authoritative interpreter of the law and the constitution, as applied to the duties of each department, including its own. The court is, in this case, called upon to exercise no other power than it exercises whenever called upon to construe a law. The Governor has no power to construe the constitution or the laws, with reference to his own duties, or those of any one else. The judiciary must interpret the law for everybody; and there is no interference in this case, with the duties or powers of the other departments. Suppose the case of an individual citizen, seeking redress for a neglect of duty on the part of the President of the United States; could the supreme court escape the duty of pronouncing what the law was, simply because the President differed with them as to the law? Unquestionably, the court would refrain from interfering with the action of the executive in any case where the executive was made responsible for that action by the constitution and the laws, and for the sufficient reason, that, by the constitution and laws, it is prescribed that the discretion, the conscience and intellect of the President, is to govern, and not the discretion, the conscience and intellect of the court. But, nevertheless, it is a necessary duty and power of the court, to decide whether the responsibility of the action is by law vested in the President or in the government. So of the Governor of this State and this court. If the constitution and laws have imposed upon the Governor a duty which requires the exercise of judgment or discretion, it is his discretion, and not that of the court, which is to control; but if they have

invested him with mere ministerial powers, in which he is neither called upon nor authorized to exercise any judgment or discretion, then it is for this court to say whether the neglect to perform that duty is a violation of law. There seems to be little force in the suggestion, that the court should not take jurisdiction, because, as the Governor commands the *posse*, the court could not enforce its decree against him; for this is applicable to every judgment and decree of the court. It is the duty of the court to pronounce the law, and it is the presumption that every other department of the government will administer it as pronounced.

The question next arising is, whether here is a neglect by the Governor to perform a plain duty, in which he is entrusted with no other than ministerial power, and has no discretion whatsoever? This is readily answered. The relator has demanded a court martial; and the law says the Commander-in-Chief shall prefer charges and convene a court. It is an act in respect to which he is entrusted with no discretion, or the exercise of any mental or moral faculty, as to whether he shall do it or not. The duty is one, which the legislature might, with equal propriety, have imposed upon any other officer or person. It is not a duty or power imposed on him by the constitution, or incidental to his position as Governor, Captain-General or Commander-in-Chief, but merely a statutory duty. As to the *time* within which this duty should have been performed, it is to be remarked that " forthwith " is the requirement of the law. The respondent does not aver that there was any impediment in the way of convening a court; but that it was in his discretion, and he did not exercise that discretion. This is the point in question here. The relator denies that this is in his discretion. To delay for twenty-one days, holding the relator under arrest, without charges, under the militia laws of Rhode Island, it cannot be pretended is not a neglect by the respondent to perform his duty. He did not see any necessity for calling a court, and was disinclined to discuss the matter, and was considering the subject, was substantially his reply to the communications oral and written of the relator's counsel. And it is of this inaction

that the relator complains. The only reason for the delay which the answer suggests is, that there are certain other things under examination, in respect to which the Governor has not arrived at a satisfactory result; a reason of which, it is sufficient to say, that it is of the very nature of Turkish justice. We have no authorities to submit at this stage of the hearing. I am not aware that any authorities are necessary, other than such as treat of the usages and practice of war as regards courts martial, to which my colleague will give references.

*Pitman* here cited Bennett's Cts. Martial, 350; McComb on Cts. Martial, 20; Dig. of Op. of Judge Advocates, (1865) 62.

*King, for respondent.*

I. This court cannot, by mandamus or otherwise, compel the Governor to perform any official duty. The three departments of government are ordinarily understood to be coördinate one with the other, so that neither can exercise any of the functions belonging to the other, having regard to the provisions of the constitution. But we say that this is true, also, in relation to the duties imposed upon the respective departments by statute. Every power exercised by the Governor and Commander-in-Chief, is an executive power. *Marbury* v. *Madison,* 1 Cranch, 173; *Decatur* v. *Paulding,* 14 Peters, 512 (Curtis' ed.); the *People* v. *Bissell,* 19 Ill. 229. *Taylor* v. *Place,* 4 R. I. 324, is a case directly in point. This court here say, " the expression ' the judicial power ' in the constitution, means necessarily all judicial power. If it does not, how much does it mean, and how much was to be excepted." Applying the same rule to the executive power, if *all* the executive power does not lodge with the Governor, how much does, and where is the rest of it?— whether that power be conferred by a statute or by the constitution itself. The relator's counsel will suggest, that it is a duty of this court to instruct the respondent in this matter. In this he is right. But to instruct, is one thing,—to direct or command, is another. The Governor, in the discharge of his duties, has to judge of facts or law. When judging of facts, nobody will seriously pretend that any power can direct him. When judg-

ing of law, this court is not merely authorized to instruct him, but bound to do so; but only when he shall ask instruction from the court. The constitution has fixed the relation between the judiciary and the executive in this regard. It is absurd to suppose that its intent was, that this court should not only advise the executive, but might direct him in any matter. Either house of the assembly, as well as the Governor, may ask advice of this court, and the court is bound to give it. The common, ordinary ministerial officers of the State, are entitled to no advice, but are subject to directions, commands, mandates from the court. If the executive be subject to the order of the court in this matter,— a matter of statute—he must be in every other analogous case. And the court may be next applied to for a mandamus to compel his excellency to designate a day of thanksgiving, or appoint a commissioner of wrecks, and so on. Suppose that certain duties which are imposed upon the judges, or upon the legislature, or upon the Governor, are not performed, what is to be done about it? The truth is, that each one of the coördinate departments of the government acts upon its own responsibility in relation to the discharge of all its duties, whatever they may be and however they may be imposed. The judiciary and the executive are amenable to the people by impeachment. That is the remedy against, and that is the punishment which is to be inflicted upon, any member of any one of these coördinate departments, who does not do his duty. This court and the Governor can be removed from office by impeachment. The constitution provides that the executive of the State shall see that the laws are faithfully executed. That is his duty. The theory is that he will do it.

. The writ of mandamus, as defined by Blackstone, Book 3, 110, is very nearly like that of our statute. There is no plan devisable by which the chief executive, in this State or in England, can be reached by such a writ.

This right of the Supreme Court to command the Governor, has been tested in several of the higher courts in the different States of this country. The question has been distinctly and directly decided several times. *Hawkins* v. *The Governor*, 1

Ark. 570; *Low* v. *Governor Towns*, 8 Georgia, 361 (referred to in *Pacific R. R.* v. *The Governor*, 23 Missou. 353, as deciding that the court have no control over the Governor in any case); *State* v. *The Governor*, 1 Dutcher, N. J. 331; *People* v. *Bissell*, 19 Ill. 229. These are the only cases where this question has come up directly, except one or two, to which I shall presently refer. There was another case in Illinois where the same doctrine was held. But the question came up only incidentally. There are some others of this class. In the other cases I have cited, four in number, this question came directly before the court, and the court held that they had no power to compel the Governor to perform any public duty. Those cases are on our side. I have been over the whole ground, and I will give the opposing counsel the benefit of those on the other side, such as they are. In the Missouri case, I find a reference to another Georgia case,—that of *Bonner* v. *Pitts*, in the 7th of Georgia, 473. In that case, I infer from what the court say in the Missouri case, the court were of the opinion that the Governor might be subjected to a mandamus. But the same court immediately afterwards overruled that case. In the case in the 8th of Georgia, a different doctrine was held, viz.: that for which we here contend. Then there is just one other case, where the question did come directly before the court, i. e., *The State* v. *The Governor*, 5th of Ohio, 528. In that case, the court held, that in a matter purely ministerial, they might direct the Governor by a mandamus.

Thus the cases stand, with four decisions of the courts of this country directly in our favor, and one against us; and all these turn upon civil questions. There was no military question involved in them at all. Attempts were made to direct the Governor as a civil magistrate, and not as a military officer or as Commander-in-Chief.

Now, I hold that all the reasons which apply to the Governor as a civil magistrate, apply with increased force to the Governor as Commander-in-Chief of the military and naval forces of the State.

It might be conceivable that the Governor, in a matter purely

ministerial and civil, might be directed by the court. But, in a matter of a military nature, all the objections I have urged against the exercise of power over the Governor, by the court, apply with increased force. The power here claimed for the court by the relator, has never been exercised. In every instance but two in this country, where an application has been made, it has been refused. In one of those the decision was overruled, and in the other the mandamus was not issued. There never has been any attempt to issue a mandamus against the Commander-in-Chief, and I do not know of any against any military officer whatever.

II. The writ of mandamus is not the proper remedy to effect the release of a man under arrest, or unlawfully imprisoned The writ of *habeas corpus* is that remedy. And again ; a mandamus is never issued, where there is another remedy, as in this case, at common law, by a suit against the respondent. *Wilkinson* v. *Providence Bank*, 3 R. I., 22.

III. The court will not interpose, as prayed, inasmuch as the convening of a court martial involves the exercise of the judgment and discretion of the respondent as the Commander-in-chief. *Decatur* v. *Paulding*, 14 Peters, 512 ; *Pacific R. R.* v. *Governor*, 23 Missou., 353 ; *State* v. *Governor*, 5 Ohio, 528. It has been contended that this duty is simply ministerial, and might as well have been devolved upon some other officer or individual ; but this is obviously an untenable position. If the court does not fix the day for the convening of a court, the relator is nowise relieved ; and the court cannot fix the day without judging of the military exigencies of the State, and assuming the functions of the Commander-in-Chief.

It is argued by the relator, that where the constitution directs the Governor or empowers him to act, the court have no control over him ; but, in cases where he is directed by statute, the court may coërce him by mandamus. Suppose that distinction to exist, it could not help the petitioner at all. Suppose the court to order the Governor to call a court martial, because he was directed to do so by the statute. The court might fix the time, and order him to comply with the statute. The court

martial is made up of military men, necessarily, as the term implies—generals, colonels, &c. But it happens that all of these officers are subject to any order of the Commander-in-Chief, and he may be of opinion that on the designated day their services are required in a remote part of the State. He has the sole right to station officers where he will. Will the court do so futile a thing as to direct him to convene his officers, when they know that he has the constitutional means to counteract the operation of that direction of the court?

IV. The court will not issue a writ of mandamus, unless it appear affirmatively and clearly that the respondent has refused to do the duty required. *State* v. *The Governor*, 1 Dutcher, 331; *Commonwealth* v. *Cochrane*, 1 Serg. and R., 273. In this case, there is no refusal at all. The Governor denies that there was a refusal, and the relator does not pretend that there was one in terms. The Governor exercised his judgment in regard to the military exigencies of the State, and the court is bound to take that judgment.

The references to the articles of war, and extracts from works on military science which have been read, are irrelevant, inasmuch as our statute, chap. 242, sec. 1, prescribes that "the usages and practices of war" are to be regarded, not the "articles of war" of the Federal Government, nor the mutiny act of Great Britain.

*Blake, for the respondent, closing:—*

For the reasons suggested, (the speaker having recapitulated the facts, and commented upon them,) it is apparent that the respondent has done no wrong, and that the court ought not to direct him what to do, or to issue any decree or mandamus against him, even upon the supposition that it has power to control him or his official acts. But we deny that the court has such power, as respects any of his duties, civil or military. The convincing argument of my colleague (King) upon this point, renders it unnecessary for me to do more than refer to some general principles, and to only one or two of the authorities.

It has been suggested that the court has already indicated that their views of the law are not in accordance with mine.

And this is true, to this extent. It has issued a citation to the respondent, in his official character, requiring him to answer at a particular day, and show cause why the court shall not peremptorily command him to do a certain act in the line of his official duties ; and this indicates an opinion of its power, not assented to by the respondent or his counsel. From the case of *Marbury* v. *Madison*, we learn that Mr. Madison, though but a subordinate of the executive, stood upon his dignity and rights, when cited by the Supreme Court of the United States, did not appear at all, and that all the proceedings were *ex parte*. But we deny especially that the court has any power to issue a mandamus against the chief magistrate in any case whatever, still less against him as the Commander-in-Chief, and upon a matter touching his duties as that military commander. If the court can direct the Governor what to do in exercising his duties, then, inasmuch as they construe the laws of the legislative branch of the government, they can declare any law to be a nullity and disregard it. And thus the government becomes a despotism, and is no longer a government by division of powers between three coördinate departments. The doctrine that the executive and legislative departments are bound by the construction of the constitution and laws which is given to them by the judiciary, we deny. I did not know that any body, at this day, maintained it, until a week ago. Each department, we maintain, is to construe the constitution and laws for itself, and is independent and unaccountable in its own sphere; and, accordingly, the Governor, in this case, has a right to act as he deems proper, and this court had no right to undertake to control him. If, however, the same matter should come up incidentally, the court would act according to its discretion.

There is no distinction between those powers conferred upon the Governor by the statute, and those conferred by the constitution. Not a case can be cited in which such a distinction is taken. The only distinction made in the books, is between acts which are merely ministerial and those which require the exercise of discretion. No court has ever yet issued a mandamus against a Governor. There is no authority for the right of a

court to do this. The decision in Ohio has no authority at all· What the court said in relation to its powers to direct the Governor in a matter of simply ministerial duty, was a mere dictum. In the first case of this kind, under the constitution of the United States, (*Marbury* v. *Madison*,) the counsel for the relator admitted, and the court admitted and decided, that anything the respondent had done, by the direction or as the agent of the Executive, the court could not interfere with.

This writ, from its nature, cannot issue to the Governor. It is true, the writ issues here in the name of the law, and not in that of the king, as in England. But its office in England is to enable the king the better to perform his duty of enforcing the laws; and its office here is the better to enable the Governor to compel obedience to law. It is a perfect absurdity, therefore, to say that the court should, by mandamus, direct the executive what to do. Besides, such a writ could not be executed against the Governor. Therefore, again, the nature of the writ shows that it cannot be issued in this case. Says Chief Justice Marshall in this very case that I have cited—" To render a mandamus a proper remedy, the officer to whom it is to be directed must be one to whom on legal principles such a writ can be directed." It is argued by the relator, that this fact furnishes no argument against the authority to use the writ. We, on the contrary, contend, that the very fact that in the contemplation of the law there is no mode to execute a writ of mandamus against the Governor, is proof that you have no authority by law to issue one. *People* v. *Bissell*, 19 Ill. It is manifest that the court's decree could be enforced, if at all, only by proceedings for contempt. Is this reasonably practicable? The Governor rightfully controls the sheriff and his *posse*. Is it reasonable to suppose that the Governor, as Governor, would deem it his duty to submit to incarceration under an order of the court for contempt? But suppose the contrary, and the Governor to be in jail: Who is the Governor then? Who is going to take command of the militia? Is this court going to do it? I have said already that your honors cannot appoint a Governor. And if you trace it out you will find that this man-

damus which is asked for, as a remedy, is perfectly absurd, and if issued could have no effect, except to bring the court or the Executive into contempt.

*Currey for the relator; closing.*

The question that the court has now to decide is, substantially, whether the people of this State are under a government of laws, or of the executive will. The merits of the case lie in a narrow compass.

(After stating the facts in the case, and commenting upon them at length, claiming to show that the respondent was guilty of a gross violation of an "imperative duty," imposed upon him by the statutes, as construed by the court, *Gould's Case,* 5 R. I., 600 App., and "the usage and practice of war;" and that the consequences of this conduct, to the relator, were of a very serious character, Mr. C. proceeded to speak of the respondent's answer.)

The answer, whether framed by himself or his counsel, is the document in which the respondent places himself upon the record. The answer contains this passage: "And the respondent says he has information of certain facts in addition to those relative to said certificates, which, though not fully authenticated, were of such a nature as to render it his duty to make further inquiry about them, and which, when so authenticated, might require additional charges to be preferred against the said Mauran." And upon this, I have two remarks to make. 1st. That it is wholly inconsistent with the respondent's letter of September 22d, requesting the relator to resign his commission, in which he says: "I take this course in preference to preferring charges, or revoking your commission." He did not then feel it to be his duty to make further inquiry. And 2d. This paragraph, taken in connection with the actual delay (now sixty-seven days,) in bringing on the court martial, is a virtual admission of the insufficiency of the charges for which the commission was revoked. It is, in effect, saying, I hope, by delay, by further inquiry, to find something against the relator on which to make sure of breaking his commission. The most lenient construction to be given to this passage is, that it is a plea for delaying the

court martial in order to find something for it to try. Another curious reason for delaying the trial, is found in the answer. Thus: " Previous to the commencement of the proceedings in this case, the Governor and Commander-in-Chief could not, with due regard to the civil and military service of the State, release the petitioner from arrest, see that the charges were duly preferred against him, and convene a court martial for his trial." These averments come from the Commander-in-Chief, it is true ; but your honors cannot believe everything. You cannot believe that there was, at the time this answer was written, or is now, or was at any time since the commission of the relator was revoked, any particular exigency in the civil and military service of this State, preventing the convening of a court martial. The labor of but five minutes, in signing and directing an order to his secretary, was all that was required to be done by him personally. There is nothing in the answer to justify the delay complained of. That delay is inexcusable.

And what then is the case now before the court? A public servant is deprived of the office which he has held for nine successive years by successive elections, upon charges of official misconduct. He demands a trial in order that he may vindicate his conduct. The law awards him a trial ; and even the stern rules and usages of military law award it to him ; the respondent in this cause alone denies it. The law is plain, his duty is plain, the right is clear. And the petitioner is without remedy, except in this court. That is the case here to-day. As a last and final resort, the petitioner comes here showing that he has exhausted every other resource for redress in vain. Here he is met by the respondent, with frivolous evasions, with new and fresh injuries placed upon the record, and with this plea of executive discretion as a bar to the court's jurisdiction. I deny that discretion any place here. I utterly deny its sufficiency as a plea in this cause. When the law, as in this case, enjoins upon the executive a specific, positive duty, pointing out both the time and the manner of its performance, I maintain that he has no discretion but to obey. The law, in such a case, neither requires of its ministerial servant nor allows him

any discretion. It is a case in which the law itself, and not the officer executing it, is responsible for consequences. The Commander-in-Chief, the Governor of the State, the Chief Executive—call him by what name we will—is not above the law. He is its minister and servant, and just in proportion as he is exalted in power, he is bound to administer and execute it. And as he is not, except as to those cases of duty involving official discretion, the interpreter of the law, he must be, with respect to his duty under it, subject to the order of this court, which is the authorized interpreter of the law. From the positive nature of the duty it is simply ministerial. Of course, we do not deny Executive discretion in proper cases for its exercise. This case illustrates the principle both of executive discretion and ministerial obedience. The revocation of the Adjutant General's commission was an act within the Executive discretion. The statute says : "The Commander-in-Chief may revoke the commission of an officer in his discretion." This is without qualification, and confers plenary power; but with the act of revocation discretion is at an end; and if the officer whose commission is revoked acquiesces, his commission is at an end. But if he demands a court martial, there is no discretion with respect to granting it, either as to the time or manner. The demand regularly made, makes the duty of granting it imperative; and what is imperative rests not in discretion.

The counsel for the respondent have cited a number of authorities, and we are told that they are as four to one against your Honors' jurisdiction. In reality few or none of them are in point, certainly not much in point. The Arkansas case, cited with so much confidence, was not this case, nor like it. The relator claimed a commission from the Governor, who questioned whether he was entitled to his commission, on the ground that the act creating the office had not taken effect at the time that he was elected to it. There is no question in this cause but that the relator here is entitled to his court martial. That is admitted by the gentlemen on the other side. In that case, the act required of the Governor was within the sphere of his political duty, pertained to his office of Governor, and was one

in which he was invested with official discretion. The court say in their opinion in the case :—"All the duties imposed upon the executive by the constitution, including the issuing of commissions, are strictly and exclusively political." The duties required of this Commander-in-Chief do not come within the sphere of his political duties, do not pertain to his office of Governor, and do not involve any discretion.

Precisely the same distinctions are to be made with respect to the New Jersey case. The question there was, whether the relator was entitled to his commission. The court decided that he was not, and that was properly the end of the cause; but they go on to dispose of the question of jurisdiction, and they decide precisely, with respect to the power of issuing commissions being political, as the court do in the Arkansas case.

The case cited from 19 Illinois has no nearer application to the case before the court than those in Arkansas and New Jersey. In the Missouri case the court gave no opinion upon the question of jurisdiction one way or the other, but expressly refrained from it. Of the case in 5 Ohio, I have only to say, that the court, speaking of the Governor of the State, says, "in regard to a mere ministerial duty enjoined on him by statute, which might have been devolved on another officer of the State, and affecting any specific private right, he may be made amenable to the compulsory process of this court by *mandamus*." And to the same effect is the language of Chief Justice Marshall in *Marbury* v. *Madison*, the opinion in which bears upon many questions in this case. Says the Chief Justice, "where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."

There is another respect in which this case is essentially dis-

tinguished from the cases cited by the counsel on the other side. This is not an application for a writ of *mandamus* against the Governor as Governor, or in any wise in his civil or political capacity. . It is against the Commander-in-Chief. There is a plain distinction between public duties inherent in the office of Governor, imposed by the constitution, and duties imposed by statute upon the Commander-in-Chief. For, although the offices of Governor and Commander-in-Chief are always held by the same individual, the functions of the two offices are entirely different. They are different in their origin and different in their character. Were it not for the militia law, the Commander-in-Chief would have no power of any kind. Whilst no statute, indeed, could take from the Governor the office of Commander-in-Chief and confer it upon another, any statute may confer all the powers that can now be exercised by the Commander-in-Chief, in that capacity, upon any other officer, for example upon the major general. This power of convening a court martial might be conferred upon the major general of the State. This is constantly done in the armies of the United States, and the armies of all nations. This distinction is not without authority to support it. It is supported by the case *United States* v. *Guthrie*, 17 How., 284, and also by *Kendall* v. *Stockton*, 12 Pet. (Curtis), 836.

It has properly been argued for the respondent, that the calling of a court martial and constituting the court, would require the exercise of discretion. Our answer is, that after this court's writ commanding the respondent to convene a court shall have been issued, he is left with all the discretion in convening it, which he would have if he did it voluntarily.

The length of time that has elapsed since the commencement of these proceedings is of importance, as bearing upon the intention of the respondent, as to calling a court at any time or not.

The court will look to all the circumstances, from the commencement of the arrest down to the present time, because their granting the writ or not, depends in some measure as to whether there is a necessity in the court to grant it, in order that the

petitioner may have his rights. And that will depend upon whether he can obtain his trial in any other manner. The convening of a court martial would end these proceedings, whilst these proceedings do not prevent the respondent from calling the court, and he might have called it any day since these proceedings commenced.

But we are told, and this is assigned as a reason against exercising jurisdiction in this case, that the Governor, the Commander-in-Chief, will resist the writ of the court. (*King*, for respondent, here denied this allegation, and said there had been no such intimation.) Then (resumed Mr. C.) I misunderstood Mr. Blake, as did also all the persons I have conversed with on the subject. In regard to this, I will only remind the court of what occurred in the court of the United States, when Mr. Hazard as counsel for the State of Rhode Island in his suit against Massachusetts, was asked by the court, what a judgment in his favor would be worth, and how he would enforce an execution. His answer was, that he then asked simply for a judgment upon the rights of his client; when he came to ask for his execution to enforce that judgment he would answer the court's question. The writ asked for is not a writ of the court. It is a writ of the State, in the name of the State, by the authority of the State; and it is not to be put here, even hypothetically, that the respondent would resist the authority of the State, and the judgment of the court. The counsel tell us that we cannot have a *mandamus* until all other remedies in the law fail, and that this is the last remedy. And they refer us to the writ of *habeas corpus*. If the writ of *habeas corpus* might relieve the petitioner from arrest, it would be but partial redress. It would leave upon him the stain of the imputation of malfeasance in office. The petitioner wants a trial in order to vindicate his character and his official conduct.

Finally, whatever may be the executive power in other States, here the law, not the executive will, is supreme. We have no tyrant autocrats in Rhode Island who may set themselves above the law—whether Governor, Commander-in-Chief, or other officer—and sport or trifle with the rights of the citizen. No

man here shall be denied the right and justice of a trial through the executive prerogative or the repugnance of the Commander-in-Chief. No man here shall be displaced from his office without a hearing as to the cause of it, and a trial as to the justice of it. No man here, like this petitioner, shall be exposed to public censure on charges of official misconduct without an opportunity of vindicating his official conduct. No man here shall have his person held in arrest and be restrained of his liberty, either through the weakness or the malice, the caprice or the discretion, of executive authority.

DURFEE J. The first question in this case is, whether the writ of mandamus lies to compel the Governor of a State to perform an official duty. The question is not a new one in the courts. In Arkansas, (*Hawkins* v. *The Governor*, 1 Pike, 570;) in Georgia, (*Law* v. *Towns*, 8 Geo. R., 360;) in Illinois, (*People* v. *Bissell*, 19 Ill., 229;) and in New Jersey, (*State* v. *the Governor*, 1 Dutch. 331,) it has been decided that the writ does not lie in such a case. In Texas, (*Houston &c., R. Co.* v. *Randolph*, 24 Texas, 317,—if the U. S. Digest, Vol. 21, p. 372, may be trusted,) it has been held that the writ does not lie to any member of the Executive department, except the land commisioner. In Maine, (*Dennitt, Petitioner*, 32 Maine R., 508,) the court refused to issue the writ to compel the Governor and Council to perform a statutory duty, but for reasons which would have led to its refusal if sued for against the Governor alone. In Minnesota, (*Chamberlain* v. *Sibley*, 4 Minn. R., 309,) the court refused to issue the writ to compel the Governor to perform a duty prescribed by the constitution, but delivered a dictum to the effect that the writ would lie to compel the Governor to perform a duty prescribed by statute, and which might be performed as well by one officer as another. In Missouri, in the case of the *Pacific R. R. Co.* v. *The Governor*, (23 Mis. R., 353,) the question was much discussed, but the court expressly refrained from giving an opinion upon it. On the other hand, in Ohio, (*State of Ohio* v. *Chase*, 5 Ohio, N. S. R. 538,) it was held that a writ of mandamus may issue to compel a governor to perform a mere ministerial duty enjoined on him by statute, and which might

have been devolved on another officer of the State; though in that case the writ was not issued, for reasons aside from the question of jurisdiction. In North Carolina, (*Cotton* v. *Ellis*, 7 Jones, N. C., 545,) the court decided in favor of the jurisdiction, and, for anything that appears, issued the writ; being the only instance which we find reported, in which the writ may have issued against a governor, except where he 'consented to the jurisdiction, for the sake of getting the opinion of the court upon the merits of the relation. These are all the cases which we find bearing directly on this point, and, from the course of decision in them, it is apparent that the weight of authority is against the jurisdiction.

One reason which has been suggested for refusing the writ, is, that if granted, it would tend to provoke a conflict between the judicial and executive branches of the Government,—a conflict in which the judiciary would prove the weaker party. Of course, in a case where the jurisdiction is clear, such a consideration could have no weight; but where the jurisdiction is problematical, the consideration affords a presumption which it would be unwise to disregard. "For," as Blackstone has remarked, "all jurisdiction implies superiority of power; authority to try would be vain and idle, without an authority to redress; and the sentence of a court would be contemptible, unless that court had power to command the execution of it." (1 Shars. Bl. Com., 242.) And in this connection it is worthy of note, that in England, from which we derive the process, not only is the King exempt from it, but, among judicial tribunals, the higher courts of judicature enjoy a similar immunity.

But the reason which has been most effectual in determining the courts to refuse the writ, is that which is drawn from the division of the powers of Government under our State Constitutions, into three co-ordinate departments, Legislative, Executive and Judicial, each independent of the others, except in so far as it is subordinated to them by the Constitution. This division is coeval with the States themselves, and has always been deemed an indispensable safe-guard of republican liberty. Mr. Madison, in the forty-seventh paper of the Fed-

eralist, traces the idea on which the division is based to Montesquieu, who borrowed it from the British Constitution, and who taught that civil freedom can not co-exist with a union of the three powers in the same hands. The analysis of government into three powers is, however, as old as Aristotle, who, (if we may trust Taylor's translation,) recognizes the " three parts of all polities," and says, "where these subsist properly, the polity must necessarily be in a flourishing condition." (Pol. B. IV. Ch. 14. et seq., Taylor's Trans.) It was the merit of Montesquieu, to develope the necessity, for the security of civil liberty, of a separate department for each of the powers ; as it was his good fortune to find a multitude of disciples ready to receive his doctrines. His book appeared in 1748, and at once became the hand-book of political philosophy, for the more enlightened statesmen of both the Old and the New World. The doctrine was, to some extent, though less systematically, produced in Blackstone's Commentaries, which appeared a few years later than " The Spirit of the Laws ; " and it so became familiar, in its practical aspects and import, not only to the more learned publicists, but to every lawyer in the land. (1 Shars. Bl. Com. 147, 269.) Accordingly, when the American colonies threw off the yoke of the mother country, and formed new governments to suit themselves, they generally, if not universally, made this division of power, except as expressly qualified, a fundamental principle of their constitutions, and in many, if not in nearly all of them, guarded each department from encroachments by explicit inhibitions. Daniel Webster, speaking of this subject in another relation, has said, "a separation of departments, so far as practicable, and the preservation of clear lines of division between them, is the fundamental idea in the creation of all our Constitutions, and, doubtless, the continuance of regulated liberty depends on maintaining these boundaries." · Webster's Works, Vol. IV, p. 122.)

The question then, is, whether in view of this principle it is competent for the court, by a writ of mandamus, to compel the Executive to do an official duty, which he delays or declines to do of his own accord? It is admitted that wherever, within

the sphere of his duties, the Executive has a discretion, he is amenable for refusing to perform them, not to the court, but only to the senate on an impeachment, or to the people at the polls. But where the duty to be performed is merely ministerial, it is claimed that a different rule obtains, and that the court may compel him to perform it. If this be true, then, to the extent of his ministerial duties, the Executive is not the co-ordinate of the judiciary, but subordinate to it, and the line of separation between the two departments is, to that extent, obliterated. Of course such a deviation from constitutional principle is admissible only in favor of some other principle of higher obligation. But the only principle adduced in support of the deviation, is the principle of the common law, that for every right there is a remedy. Evidently that is not enough; for a principle of the common law cannot over-ride a principle of the constitution. Consequently we find it admitted, even in cases which hold that a writ of mandamus is issuable to the Governor, that it will not issue to enforce a duty which is enjoined on him by the Constitution, or which he alone can perform, but only to enforce a *statutory* duty, which might as well have been devolved upon any other individual, the theory being that, as to such a duty, the Governor is on the same footing as any other individual who might have been designated to perform it.

The distinction, however, between these two classes of duties, which is thus recognized by some of the cases, is, by others of them, either ignored or expressly repudiated. In this case it has been urged as applicable in favor of the relator, and its validity has consequently been much discussed. But whether the distinction be valid or not, we deem it unnecessary to determine; for the duty which we are here asked to enforce, though prescribed by statute, could not have been properly devolved on any one but the defendant. It is a duty to see that charges are preferred against a military officer, and that a court-martial is convened for his trial, to consist of the highest military officer in the State except the defendant, and of several other officers of superior grade. To confide such a duty to any one except the Commander-in-Chief would be an

extraordinary transgression of military usage; and, in a time of actual service, might occasion the most embarassing, if not fatal disorders.

In this aspect of the case, however, the counsel for the relator argues, that the decisions which have been cited are not applicable at all as authorities, for the reason that they were decisions in cases where the writ was sued for to compel the Governor to perform a civil or political duty; whereas, in this case, the writ is sued for, not against the Governor as such, but against the Commander-in-Chief, to compel him to perform a military duty. The idea is, that the office of Governor is separable from that of Commander-in-Chief, and that while as a civil magistrate the Governor may be exempt from the writ, as Commander-in-Chief he is subject to it. We do not think the Constitution warrants any such discrimination. The Constitution declares that "the chief executive power of this State shall be vested in a Governor," and, in a subsequent section, declares that the Governor "shall be Captain-General and Commander-in-Chief of the military and naval forces of this State." In this respect it is similar to the Constitutions of the other States, and to the Constitution of the United States, which again is similar to the British Constitution, under which the King is the Generalissimo, or the first in military command in the kingdom." (1 Shars. Bl. Com. 262.) The supreme military command is thus universally recognized, in all governments professing a separation of the three powers, as a portion of the chief executive power. (See 1 Kent's Com. 5th Ed., 282.) Indeed, in time of civil convulsion, it is the most important portion of that power. Supreme military command is in fact implied necessarily in the grant of the chief executive power. The mere fact, then, that the Governor, in his different capacities, is designated by different titles, does not sever the unity of his office. When inaugurated, he takes but a single oath, which binds him in all his functions. If impeached and deposed, the sentence of deposition would deprive him of all his functions, whether impeached for a misdemeanor committed as Commander-in-Chief, or as a civil magistrate. But if, under the American system of

Mauran, Adjutant General, &c., *v.* Smith, Governor, &c.

government, the supreme military and civil authority is thus inseparably united in the Governor; then he is no more subject to the control of the judiciary in the one capacity, than in the other. We think, therefore, that the discrimination suggested by the counsel for the relator is inadmissible.

But in reply to all this line of reasoning, it is reiteratively urged that, if in this case the writ of mandamus does not lie, then the relator is without redress, and the great maxim of the law, that for every right there is a remedy, is egregiously falsified. This is an argument to which no court of justice can be insensible. It cannot escape remark, however, that the maxim which is quoted comes to us from England, where it is subject to the same exception in favor of the King, which is here claimed in favor of the Governor. Indeed, it is one of those maxims which must, from the nature of things, be understood with some qualification. If, for instance, it were decided that the Governor is amenable to the writ, the court might, nevertheless, unjustly refuse it, and there would then be no remedy for the wrong, except that which is as applicable to the Governor as to the court, to wit: the remedy by impeachment. The answer which naturally occurs to this is, that it is not to be presumed that the court will be guilty of such an injustice. But, since this presumption must be made somewhere, why should it not be made in favor of that branch of the government on which the duty to be performed is primarily imposed, as readily as in favor of its coördinate? Such a presumption, however inapplicable to an inferior officer, does not seem inappropriate to a magistrate who is clothed by the Constitution with the supreme trust of taking " care that the laws be faithfully executed," and who is privileged, in the execution of his office, to consult the judges of this court as his legal advisers.

We think, therefore, that the court has no jurisdiction to issue its writ of mandamus, to compel the defendant to perform the duty which in this case he is alleged to have disregarded.

Of course, in coming to this conclusion, we unequivocally admit that the Governor of a State is amenable to the court like any other person for his private acts, or for any act not properly

within the scope of his office, though done under the color of his office.

But though we think the application ought to be dismissed for [want of jurisdiction, we deem it not improper to say that, even if we had jurisdiction, we should not deem this a case for granting the writ, at least in a peremptory form. A writer on the law of mandamus says : " It is an imperative rule of the law of mandamus, that previously to the making of the application to the court for a writ to command the performance of any particular act, an express and distinct demand or request to perform it must have been made by the prosecutor to the defendant, who must have refused to comply with such demand, either in direct terms, or by conduct from which a refusal will be conclusively implied." (Tapping on Mandamus, p. 282, cited in *People* v. *Romero*, 18 Cal. R. 89 ; and see *Rex* v. *Brecknock*, 3 Ad. & El. R. 217, and the cases cited for the defendant.) Now, in this case, there has been no express refusal, and no conduct which is conclusively equivalent to a refusal. The defendant sets forth in his answer, that when requested to perform the duty which we are asked to enforce, he replied, that he had the matter under consideration. But the relator claims, that to hold the matter under consideration, as the defendant did, for twenty-one days prior to this application, was a virtual refusal. He contends that the defendant, by the statute, was bound to proceed " according to the usage and practice of war," which, he says, means according to the " Rules and Articles of War," as established by act of Congress; and he shows that, according thereto, an officer who has been put under arrest must be served with a copy of the charges on which he has been arrested " within eight days thereafter," and " be brought to trial within ten days thereafter, unless the necessities of the service prevent such trial," &c. He accordingly argues that the defendant, having exceeded the limit of the discretion allowed by this article, has virtually refused to comply with the relator's request. And if it were true that the statute, when it speaks of " the usage and practice of war," means the " Rules and Articles of War," there would be great cogency in the argument.

But it is demonstrably certain that such is not the meaning of the statute. As we have seen, the Rules and Articles prescribe, subject to the exception of necessity, that an officer who has been arrested shall be served with a copy of the charges within *eight days*, and brought to trial within *ten days*, after his arrest. But our statute (Rev. Stat., chap. 242, sec. 11) provides that the officer under arrest shall be served with a copy of the order for the court martial, and a copy of the charges against him, " twenty days before the sitting of said court," thus making it utterly impossible to meet the requirement of the " Rules and Articles of War," that he shall be " brought to trial within ten days " after his arrest. This puts it beyond question that, in this respect at least, the phrase, " usage and practice of war," employed in the statute, does not mean the " Rules and Articles of War." But if this be not meant, then the question recurs, whether the defendant, in holding the relator's request and the matters involved in it under consideration for twenty-one days, has exceeded the large discretion vested in a Commander-in-Chief " according to the usage and practice of war," and consequently may be adjudged to have refused to comply with that request. We are not ready to adopt that conclusion, and could not therefore, in the present aspect of the case, even if we thought we had jurisdiction, consent to grant the writ,—certainly not in a peremptory form. But with the view which we hold of the question of jurisdiction, of course we cannot assent to the issuing of the writ in any form, either peremptory or alternative.

The application must, therefore, be dismissed.